THE HONORABLE JAMES L. ROBART

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | No. CR25-122 JLR |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MR. ATWATER'S SENTENCING MEMORANDUM |
| | ) | |
| ANDRE ATWATER, | ) | |
| Defendant. | ) | |
| | ) | |

Andre Atwater, through counsel, joins Probation in asking the Court to impose an 18-month sentence, with credit for time served in custody since his arrest on June 23, 2024.

## I.    INTRODUCTION

Andre Atwater was a gun enthusiast, hobbyist, and collector. He has always loved learning everything he could about firearms, how they worked, how and where they were built, the different kinds of firearms that were popular at different times of American history, and the types of accessories and decorations available for them. Andre's collection included purple guns, gold guns, multicolored guns with etchings on them, and rifles that had historical significance. Dkt. 28 at 4 (Government Sentencing Memorandum). He got gun-related tattoos, spent hours on YouTube and gun hobbyist websites, and would have called himself "kind of a gun nut," if asked.

On June 23, 2024, Andre used a bb-gun—not any of the firearms he had in the home—to shoot at two individuals in his apartment building's parking lot. These same

MR. ATWATER'S SENTENCING MEMORANDUM
(*United States v. Atwater*, CR25-122-JLR) - 1

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

two individuals had basically been living in the lot, using drugs and often causing commotion. For a brief period, the complex hired a security guard, but this was short-lived. Andre and his fiancée Ana had replaced their car windows multiple times after having them smashed in and were nervous that the thefts would escalate or that the individuals would become more erratic. They were looking for new places to live, but Andre wanted to stay close to his job. On June 23, 2024, after hearing partying and fighting in the lot again, he made the stupid decision to shoot at them with a bb-gun. He was trying to scare them away. This was what led to the search of his apartment and the charges in this case. He was sentenced to nine months for the assault.

The government's sentencing memorandum and the presentence report ("PSR") include details and photos of the firearms, firearms parts, accessories, and tools for building firearms found in Andre's apartment. But hidden in the introduction to the government's sentencing memorandum is the concession that "**at that time, [Mr.] Atwater legally possessed these firearms,** [although], he also possessed some dangerous illegal contraband"—namely, the conversion devices that he is being sentenced for by this Court and two silencers. Dkt. 28 at 2. Andre was not designing or printing the conversion devices or silencers. Nor was he selling them.

This conviction puts an end to all firearm possession for Andre, and he has already started to refocus his brain on something new—getting "certified to become a welder as that seems to fit [him] and [his] interests." Ex. 1 (Andre Atwater Letter).

## II.    HISTORY AND CHARACTERISTICS OF ANDRE ATWATER

The detailed PSR and the report of Dr. Grace Iarocci expertly lay out Andre's personal history, the challenges he has faced, and the challenges he will face moving forward. *See* Ex. 2 (Report of Dr. Grace Iarocci) (filed under seal).

Andre's childhood and young-adulthood were marked by trauma—abuse and neglect were the norm. His ACES score is a nine out of ten. PSR ¶ 58. Throughout his

MR. ATWATER'S SENTENCING MEMORANDUM
(*United States v. Atwater*, CR25-122-JLR) - 2

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

youth, intervention from child protective services was constant, and he and his siblings

came to expect that the authorities would be involved in their family's life.

Avonte Atwater, Andre's older brother, acknowledges the chaos and negligence in their

home, candidly stating:

> I want to take a moment to be honest about something. I was one of the
> older brothers who, without fully realizing the harm it would cause,
> contributed to that environment. I held parties in the home that exposed
> Andre to things no young child should have seen. I look back now with
> regret and wish I had protected him instead of adding to the instability. I
> share this not to make excuses, but because I believe it is important for
> the Court to understand that Andre did not get the chance to grow up in a
> safe or supportive environment.

Ex. 3 at 2 (Letter of Avonte Atwater).

Despite what he witnessed and experienced in his home, Andre was and remains

a soft-spoken, gentle, and tenderhearted young man who has retained a hopeful and

optimistic outlook. Ex. 2 at 5. ("Despite these challenges, Mr. Atwater is described as

kind, protective, and family-oriented, often helping relatives in need."); Ex. 3 at 8

(Letter of Mitchell Bugert) ("In all the years we've known each other, I never fought

with Andre. We may have argued at times, but instead of fighting, we always worked

things out by talking. That maturity stood out even when we were young.").

Raised in a home where instability, verbal abuse, and volatility was the norm,

Andre first sought community and stability through football. Unfortunately, after being

diagnosed with epilepsy in middle school, this outlet was no longer an option. Within a

few years, he began to forge his own path, finding employment and working as many

hours possible. As the PSR notes, Andre started working while still in high school and

has been steadily employed since then. PSR ¶¶ 67–72 (detailing regular and consistent

employment from 2016 until the date of arrest in 2024). He has never been afraid of

hard work and this characteristic is fundamental to who he is. As his sister in-law states:

MR. ATWATER'S SENTENCING MEMORANDUM
(*United States v. Atwater*, CR25-122-JLR) - 3

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Even as a teenager, Andre did what he could to create stability. I remember when he got his first job at Burger King and how dedicated he was, even then. He showed up, learned quickly, and took pride in doing things the right way. That same dedication showed up in his work as a caretaker in nursing homes. He does not go to work only for a paycheck. He connects with residents, listens to their stories, and treats them with respect.

Ex. 3 at 4 (Letter of Brandi Cottrell).

## A.    Hyperfixation and Special Interest in Firearms

Although undiagnosed, and seemingly misinterpreted as symptoms of his seizure disorder, childhood neglect or lack of guidance or structure, Andre showed hallmark signs of a neurocognitive disorder that grew increasingly symptomatic as he got older. Ex. 2 at 4–5 (discussing reflections from family about Andre struggling with understanding sarcasm, misinterpretation of social situations, and rigidity in routine that were often assumed to be part of his seizure disorder).[1] Notably, Andre began fixating on special interests—obsessing for months about a topic and discussing it with his peers nonstop. Eventually, Andre landed on firearms. He explains that "[a]s a child I was very interested in firearms, when I started collecting my biggest concern was firearm safety and discipline. Firearms became my special interest[]; I was very interested with how they worked and functioned. It [was] relaxing for me and [I] was able to find peace at a very difficult time in my life." Ex. 1 (Andre Atwater Letter).

---

[1] Notably, when defense counsel reached out to Andre's grandmother to discuss the summers he had spent with her and her reflections on him, she had assumed he had already received an autism diagnosis and that he had received services for this throughout elementary and middle school. A review of Andre's school records showed he had never received such a diagnosis or support for challenges he experienced in school because of it.

FEDERAL PUBLIC DEFENDER
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
(206) 553-1100

Eventually, Andre fantasized about making this special interest all-encompassing, either by starting his own firearm business or, once he got his GED and felt like his small family was more financially secure, working for an agency like the ATF. Approximately a month and a half before his arrest, Andre registered for a business license online and hung the unframed paper certificates on the wall of his apartment once he received them. He put them next to a photo of his son as a reminder of his *eventual* goals and inspiration.





Bates nos. 000047–48.

There is no "company" or "business." Andre got the license approximately a month before his arrest in this case and taped it up on his wall to inspire him. He has never done any business, whether related to firearms or otherwise, under this business name *or any other*. The government's inferences otherwise have no basis in reality or in the evidence.

**B.    Building His Future**

As he built toward his dream of having his own firearms business, Andre also found a fulfilling job that was an incredible fit for him and his limitations. From 2019 until his arrest in 2024, Andre worked as an activity coordinator for nursing homes. PSR ¶¶ 69–71. This work highlighted his "autistic strengths and preferences that aligned well with that role. He specifically valued the structured routines and clear expectation. . . . " Ex. 2 at 9. Throughout the year before his arrest, he was working toward foundational goals as well; he had enrolled in a GED course and was set to take the test a few days after his arrest. He was participating in a training that would have resulted in a promotion and better pay at work. His fiancée was pregnant, and they were

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

trying to figure out where they wanted to live and raise their children. Both of them were looking forward to Andre earning his GED and professional certification because it opened up more options for them. Things were looking good.

Andre will still be able to get his GED with this conviction. But it is unlikely he will be able to return to work in nursing homes and he certainly will not be able to fulfill his dream of having a firearms business.

## III.    THE OFFENSE

Andre and his fiancée Ana had moved to Seattle to be closer to his job. It was the first time Andre had lived in a proper city, and he knew almost immediately it was not for him. Fights frequently broke out on the apartment complex's property, people were using and selling drugs in their parking lot and in the streets surrounding their complex, and neither he nor Ana were comfortable during the evening in the neighborhood. Ana worked from home and was afraid to leave the apartment unless Andre was with her, and their work hours often did not match up.

Before he moved in with Ana and after he'd broken up with his first child's mother, he lived out on property his dad owned. It was a fairly rural property, and Andre did not have much to do while he was out there. Without something else to occupy him, Andre's interest in firearms accelerated, and he spent hours online when he wasn't working. He became a frequent lurker on firearm hobbyist websites and video channels. There were discussions of what the "coolest" and most powerful guns were, the most aesthetically pleasing decorations and parts, and videos of people openly talking about accessorizing their weapons with illegal modifications and how to come very close to the line of ATF regulations but not cross it.

This time period corresponded with the rising media interest in ghost guns and partial kits. Internet gun shops were frequently changing their policies depending on the most recent ATF regulations, advisories, or what online commenters opined would be

MR. ATWATER'S SENTENCING MEMORANDUM
(*United States v. Atwater*, CR25-122-JLR) - 7

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

legal or illegal under federal regulations. These same self-renowned "experts" often held strong Second Amendment views that minimized the dangerousness of accessories such as conversion devices, bump stocks, and silencers.

Andre was admittedly sucked into this online world. He had broken up with the mother of his eldest child and he was lonely and depressed. Though he never embraced the extremist views that were held by some of these "keyboard warriors," Andre was curious and susceptible to arguments about the right to bear arms, the idea that responsible gun owners are not violent, and his feeling that people like him wouldn't use automatic weapons to hurt people or use silencers to hide their crimes, so it wasn't so bad for him to have them. Undoubtedly Andre's neurocognitive challenges made it difficult for him to understand the nuance underlying these black and white arguments he was adopting—he rationalized his conduct by telling himself that if he would never use these types of accessories to hurt someone or to cover up a crime, they were okay for him to have. It was during this time that he got the "bulk" bag of glock switches.

As his relationship with Ana got more serious, Andre's interest in the illicit accessories, the online community of gun enthusiasts, and the "gun rights influencers" slowly receded. He was filling the time that he had spent online with a substantive and rewarding relationship. But he did not abandon his special interest in and hyperfixation on firearms. Andre moved his gun collection and tools with them to their small apartment. He still had the switches and the silencers. He was not actively seeking any more illegal parts, he was not selling them, and he was not using his printer to create more.[2] But he didn't get rid of them and—as Andre admits—there was still a small piece of him that didn't think it was that big of a deal, because he would never use them in a violent or dangerous way.

---

[2] The government executed a search warrant for the 3-D printer found in Andre's apartment and found no evidence of designing or printing glock switches or other illegal parts.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Andre has moved on from this view. He knows that he "made mistakes and lacked good judgement" and that "in the wrong hands these items are very dangerous to our community." Ex. 1 at 1. Andre is embarrassed by the state of the apartment when the police searched it, recognizing that the firearm safety and discipline he was so proud of was completely set aside and that "having that many firearms in a small place with babies was very i[r]responsible of [him] to do." Ex. 1 at 2.

## IV.    THE REQUESTED SENTENCE

A three-year sentence is greater than necessary to punish or deter Andre. The rules have been made clear. The greatest consequence for him has been that his own conduct has left him branded a criminal who cannot possess firearms. Andre's family, friends, and counsel have spent significant time talking to him about the importance of shifting his focus and interest away from firearms and toward something else.

Being away from his family has been devastating for Andre. This is his first interaction with the criminal system, his first time in jail, and his first time being separated from those he loves. As each and every letter to the Court notes, becoming a father was transformative for Andre. Ex. 3 at 5 ("I will never forget receiving the FaceTime call when he learned he was having his first baby. His smile was so big it could not be wiped away."); *id.* at 8 ("I had the privilege of watching Andre grow into fatherhood, which was one of the most inspiring things to witness."); *id.* at 3 ("He speaks often about wanting to be the best dad he can be. I know that is what drives him now, more than anything."). Andre has not yet held or kissed his youngest child. Because he and Ana are not legally married, she has been unable to visit him with their children while he has been at SeaTac.

In addition, Andre feels like he has let down his country. He is a truly patriotic individual. The photos taken of the crime scene show that he and Ana—like most of the other residents of the apartment building—had hung flags over their windows to block

the light from the streetlamps. One of Andre's windows was covered by an American

flag with a blue line and a red line to support law enforcement officers and firefighters.[3]



Bates no. 000009.

Andre sees his actions as a betrayal of his own values as someone who strongly

believes in the privilege of exercising a Second Amendment right and as a betrayal of

his support of the American values he perceives as pro-law enforcement and law-

abiding.

Being formally diagnosed with autism has been an unexpected relief for Andre.

Ex. 1 at 2. It helps him contextualize some of his struggles and to see a path forward.

While in custody, he has focused on Bible study and a renewed interest in religion and

his own value structure. *Id.*

---

[3] The apartment's other windows were covered by a flag with the phrase "Hunting Wild
Life Adventure" and a picture of an elk skull and a character from Spongebob
Squarepants.

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

Again, unlike many other young men whose response to incarceration is to grow cynical, despondent, or bitter, Andre's time in custody has had the opposite impact on him. His brother notes that "[o]ne thing that stands out about Andre during this time is his attitude. He has spoken respectfully and even positively about the attorneys, the prosecutors and the judges involved in his case. That kind of attitude is rare for someone in his position. He is not bitter. He is reflective. He is learning from this and he wants to do better." Ex. 3 at 3. This is the same attitude the defense team has observed in Andre, first when visiting him in the King County jail system and then at FDC. Andre was prepared to take responsibility for his actions almost immediately. The government and defense were able to negotiate a resolution to his federal case before he even made his initial appearance. He is taking all the right lessons from this experience—his questions and reflection on his time in custody with counsel and his family are always directed toward never being in this situation again. Andre was prepared

## V.   CONCLUSION

The defense joins Probation's recommendation and asks that the Court sentence to Mr. Atwater to 18 months in custody. This is a modest variance from the low-end of his Guideline range of 21–27 months, but is supported by Andre's history and characteristics, the disproportionate impact this conviction will have on his future as a young man who will need to completely change his trajectory, and by his early acceptance of responsibility.

Andre hopes to release from custody and go live with his fiancée and her family in Eastern Washington. This was an intentional decision for them. He is looking forward to starting again with his family in a place far away from the kind of stressful and overwhelming city living they encountered in Seattle. While this conviction will

MR. ATWATER'S SENTENCING MEMORANDUM
(*United States v. Atwater*, CR25-122-JLR) - 11

**FEDERAL PUBLIC DEFENDER**
**1601 Fifth Avenue, Suite 700**
**Seattle, Washington 98101**
**(206) 553-1100**

follow him for the rest of his life, Andre has strong family support, a wonderful partner, and is an incredibly hard worker. This will not be the defining chapter of his story.

DATED this 13th day of January 2026.

Respectfully submitted,

s/ *Sara Brin*
Assistant Federal Public Defender
Attorney for Andre Atwater

MR. ATWATER'S SENTENCING MEMORANDUM
(*United States v. Atwater*, CR25-122-JLR) - 12